IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-02807-PAB-SKC

ALEXANDER HOOD, on behalf of himself and all similarly situated persons,

Plaintiff,

v.

AMERICAN AUTO CARE, LLC and BEACON FINANCIAL SOLUTIONS, LLC, both Florida limited liability companies, JESSIE BRITT, KYLIE BRITT, and DAVID GLENWINKEL, each individuals, ROYAL ADMINISTRATION SERVICES, INC. a Florida corporation, CARGUARD ADMINISTRATION INC., a Kansas corporation, MATRIX WARRANTY SOLUTIONS, INC., d/b/a ELEMENT PROTECTION PLANS, a Nevada corporation, and EGV COMPANIES, INC., d/b/a OMEGA AUTO CARE, a Delaware corporation,

Defendants.

---

**DECLARATION OF PLAINTIFF ALEXANDER HOOD**

---

I, Alexander Hood, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Plaintiff in the above-caption case.

2. I am also a public interest attorney and admitted to practice in this Court.

3. I purchased a used car in 2017.

4. Soon after that purchase, I began receiving calls on my cell phone telling me that my car's warranty was expiring and offering to sell me an extended warranty.

5. These calls usually began with a pre-recorded message.

6. I had difficulty simply ignoring the calls because the caller ID for the calls typically showed a Vermont area code—like the Vermont area code in my cell phone

number—and therefore I typically picked up the calls because I thought they could be from family or friends in Vermont, where I grew up.

7. These calls frequently happened while I was working and frequently interrupted my work.

8. One such call happened on August 17, 2018, while I was working in my home office in Dillon, CO.

9. The pre-recorded message said my car's warranty was expiring and asked if I was interested in extending it.

10. The pre-recorded message then asked if I had less than 150,000 miles on my car.

11. I indicated that it did and was taken to a live person.

12. The live person identified herself as Meghan (I am unsure of the spelling of the name).

13. I asked if she was from the dealership where I bought my car and she said no.

14. She said she could not tell me where she was calling from for "privacy" until I identified my car.

15. I told her I had a Toyota Prius and a Toyota Rav4.

16. She somehow identified that they were both 2012 model years and then said I qualified.

17. Before she could ask more questions, I again asked where she was from and she said "America Auto Care."

18. I then said I wasn't interested and hung up.

19.     I subsequently requested my phone records from my cell phone provider, Xfinity Mobile.

20.     Attached as Exhibit 1 to this declaration are my phone records from August 17, 2018.

21.     Because I am an attorney and because many of my calls from that day are potentially work product or otherwise privileged, I have redacted call records involving my work as an attorney. My personal calls are left unredacted.

22.     The relevant call is highlighted and bolded and is a 4-minute incoming call from 8025788675 at 21:42. I am unsure what time zone that 21:42 time reflects.

23.     After receiving the call, I researched America Auto Care ("AAC").

24.     I found its website here: http://americaautocare.com/

25.     In the upper righthand corner of the main page, I noticed a button that



looked liked this:

26.     I clicked on the button and it took me to a website with over 400 customer reviews from AAC customers from all, or almost all, states.

27.     From those reviews, it was clear that AAC makes calls across the country attempting to sell its extended warranties, including to Colorado, and that it in facts sells its extended warranties across the country, including in Colorado.

28.     For example, I found the following reviews from customers in Aurora, CO, Denver, CO, and Golden, CO:



Daniel of Aurora, CO ✔ Verified Reviewer $ Verified Buyer

Original review: Jan. 24, 2019

Nissan's Rogues are known to have transaxle problems. So, after I got to the end of the warranty for mine, I wanted more coverage. America Auto Care contacted me after I contacted Nissan for a service contract. Their rep explained the plan to me and when I got the paperwork, everything was pretty clear. He did a good job.

HELPFUL | Be the first one to find this review helpful

Patrick of Denver, CO ✔ Verified Reviewer $ Verified Buyer

Original review: Nov. 9, 2018

I needed some extended warranty on my truck. I called America Auto Care and getting a warranty from them went quickly. They explained everything to me and took me with the monthly bill. They were good and the rep I worked with did things professionally. I'd tell others that America Auto Care will treat them well and fair. They should look into it.

HELPFUL | Be the first one to find this review helpful

Susan of Golden, CO ✔ Verified Reviewer $ Verified Buyer

Original review: Sept. 15, 2018

America Auto Care was more affordable than their competitors when I was looking for a typical warranty to cover my vehicle. They have helpful representatives and I got what I needed to be done. I'm still within my first 30 days and so far, everything is good.

Sept. 19, 2018

America Auto Care response

Hi Susan,

If you have any questions after reviewing your policy, give our customer service team a call and they would be happy to answer any questions you may have. Our customer service number is 888-497-3572. Thank you!

HELPFUL | Be the first one to find this review helpful

29.     That website also boasts that "America Auto Care will cover repairs if they are made at an ASE-certified repair facility. **These repair facilities are present throughout the United States and Canada, meaning an America Auto Care extended auto warranty can cover you even while you're traveling**." Emphasis added.

30.     Moreover, I also researched the company itself and found public Court records in Florida with regard to a dispute among AAC's owners.

31.     In those court records, I found the Complaint in the case with the AAC operating agreement attached as an Exhibit.

32.     This Complaint and operating agreement are attached as Exhibit 2.

33.     These documents explain the relationship between AAC, BEACON FINANCIAL SOLUTIONS, LLC ("Beacon"), JESSIE BRITT, KYLIE BRITT, and DAVID GLENWINKEL.

34.     According to the Complaint, Kylie Britt, Jessie Britt, and David Glenwinkel (together, the "Individual Defendants") formed Beacon as a "debt settlement business" in April 2016. Beacon performed this business from a "call center" using telephones. Ex. 2 at 6.

35.     In June 2016, the Individual Defendants met and discussed "taking a different direction with Beacon's call center" by using its call center to sell vehicle service contracts (VSCs), *i.e.*, the extended car warranty I was offered in the phone call described above. *Id.*

36.     The Individual Defendants "wanted their participation and investment in Beacon to carry over to [AAC] because they decided to used Beacon's call center for

[AAC]." *Id.* at 7.

37. According to the memorandum of understanding ("MOU") forming AAC, "The MOA [*sic*] exists specifically to address the mutual understanding and representations of the [ownership group] in the operation of an Auto Warranty Business, operating a Retail Call Center, with a corporate headquarters and operational Call Center, an Affiliate Call Center Program and a proposed entry into the Dealership Auto Warranty Market." *Id.* at 11.

38. The MOU assigns rolls and responsibilities to each of the Individual Defendants in the operation of this "Auto Warranty Business" operating a "Retail Call Center." *Id.* at 13.

Respectfully submitted,

By: [signature] 5/30/19
Alexander Hood
Plaintiff

# Exhibit 1

| CallDate | TimeZone | MDN | ToNumber | Minutes | InOut |
|---|---|---|---|---|---|
| 8/17/2018 16:16 | 0 | 8025785682 | 7206181617 | 42 | I |
| 8/17/2018 18:20 | 0 | 8025785682 | 3039461403 | 2 | I |
| 8/17/2018 18:23 | 0 | 8025785682 | 3039461403 | 10 | I |
| 8/17/2018 19:39 | 0 | 8025785682 | 8558789189 | 6 | O |
| 8/17/2018 20:35 | 0 | 8025785682 | 7205170303 | 9 | O |
| 8/17/2018 20:43 | 0 | 8025785682 | 3039461403 | 1 | O |
| 8/17/2018 20:45 | 0 | 8025785682 | 3039461403 | 4 | I |
| **8/17/2018 21:42** | **0** | **8025785682** | **8025788675** | **4** | **I** |
| 8/17/2018 22:33 | 0 | 8025785682 | 6037709841 | 2 | I |

# Exhibit 2

# Exhibit "A"

Filing # 60476186 E-Filed 08/16/2017 11:44:38 AM

Date Served 9/18/17
Time Served 9:50pm
Intials RS
ID# RIGO TELLEZ

LA 2014283953

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO.: 50-2017-CA-009184-XXXX-MB

BEACON FINANCIAL SOLUTIONS, LLC,
a Florida limited liability company, and
AMERICA AUTO CARE, LLC,
a Florida limited liability company, and
KYLIE BRITT, an individual; and
JESSIE BRITT, an individual; and
DAVID GLENWINKEL, an individual,
Plaintiffs,

v.

RAMIN AMIREBRAHIMI
(a/k/a RYAN AMIR), an individual,
Defendant.
_____________________________/

**SUMMONS**

TO DEFENDANT: **RAMIN AMIREBRAHIMI**
**(a/k/a RYAN AMIR)**, an individual
831 2nd Street Unit 1
Santa Monica, CA 90403

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint/petition with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff's attorney" named below.

**Bryan J. Yarnell, Esq.**
**712 U.S. Hwy One, St. 301-24,**
**North Palm Beach, Fl. 33408**
**(561) 952-0671**

**THE STATE OF FLORIDA**

**TO EACH SHERIFF OF THE STATE:** You are commanded to serve this Summons and a copy of the complaint in this lawsuit on the above-named Defendant.

**DATED** on Aug 16 2017, 2017.

By: ______________________
As Deputy Clerk
N.RIOS

FILED: PALM BEACH COUNTY, FL, SHARON R. BOCK, CLERK, 08/16/2017 11:44:38 AM

*IMPORTANTE*

*Usted ha sido demandado legalmente. Tiene 20 Dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lon protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.*

*Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).*

*IMPORTANT*

*Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vou souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).*

*Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.*

*In accordance with the Americans with Disabilities Act, persons in need of a special accommodation to participate in this proceeding shall within a reasonable time prior to any proceeding, contact the Administrative Office of the Court, 205 North Dixie Highway, West Palm Beach, Florida 33401, telephone (561) 355-2431, 1(800) 955-8771 (TDD), or 1 (800) 955-8770, via Florida Relay System.*

Filing # 60454542 E-Filed 08/15/2017 10:34:50 PM

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO.:

**BEACON FINANCIAL SOLUTIONS, LLC,**
a Florida limited liability company, and
**AMERICA AUTO CARE, LLC,**
a Florida limited liability company, and
**KYLIE BRITT,** an individual; and
**JESSIE BRITT,** an individual; and
**DAVID GLENWINKEL,** an individual,
Plaintiffs,

v.

**RAMIN AMIREBRAHIMI**
**(a/k/a RYAN AMIR),** an individual,
Defendant. /

## COMPLAINT FOR DECLARATORY RELIEF

**COMES NOW,** Plaintiffs, BEACON FINANCIAL SOLUTIONS, LLC ("BEACON"), AMERICA AUTO CARE ("AMERICAN AUTO") KYLIE BRITT ("KYLIE"), JESSIE BRITT ("JESSIE"), DAVID GLENWINKEL ("DAVID"), by and through their undersigned counsel, hereby sue Defendant RAMIN AMIREBRAHIMI (a/k/a RYAN AMIR) ("AMIR") for a declaration of the parties' respective rights, duties, and obligations with respect to each other and for a declaration of the parties' respective present and future ownership interest in BEACON and AMERICA AUTO which is wholly owned by BEACON (BEACON and AMERICA AUTO will jointly be referred to as the "COMPANIES").

## PARTIES

1. Plaintiffs, BEACON FINANCIAL SOLUTIONS, LLC, ("BEACON") and AMERICAN AUTO CARE, LLC ("AMERICA AUTO"), are both Florida limited liability companies with principal places of business in Florida and who are nominal parties to this action since the parties' agreement requires a buyout by the company of a terminated members' interest.

2. Plaintiffs, JESSIE BRITT ("JESSIE") and KYLIE BRITT ("KYLIE"), are married, are *sui juris* and both reside together in Palm Beach County, Florida. KYLIE and JESSIE together own 50% of the COMPANIES and each actively participates in the business of the COMPANIES.

3. Plaintiff, DAVID GLENWINKEL ("DAVID"), is *sui juris* and a resident of California. DAVID owns 25% of the COMPANIES and actively participates in the business of the COMPANIES.

4. Defendant, RAMIN AMIREBRAHIMI (a/k/a RYAN AMIR) ("AMIR") is *suri juris* and a resident of California. AMIR owns 1/3 of 50% of the COMPANIES but he has not actively participated in the business of the COMPANIES.

**JURISDICTION AND VENUE**

5. Jurisdiction is proper in the Circuit Court of Florida because the agreements were negotiated in Florida and the COMPANIES organized under Florida law and then operated in Florida, and the amount in controversy exceeds $15,000 exclusive of interest costs and attorney's fees.

6. This Honorable Court has jurisdiction to declare the rights of the parties pursuant to Chapter 86 of the Florida Statutes entitled "Declaratory Judgments". Specifically, section 86.021 grants the Court the power to construe contracts and declare the rights of the parties; section 86.031 grants the Court authority to do so before or after a material breach has occurred.

7. Venue is proper in Palm Beach County, Florida pursuant to Section 47.011 of the Florida Statutes because the transactions and occurrences described herein occurred in Palm Beach County, Florida where the only Florida residents who are parties to this action reside.

**BACKGROUND**

8. On February 16, 2016, KYLIE organized BEACON by filing articles of organization with the Florida Secretary of State. DAVID provided the initial one hundred thousand dollars

($100,000 USD) of funding for BEACON which was established to engage in the debt settlement business. In mid-January 2016, AMIR started talking with the other parties about joining with then in BEACON; however, he did not invest any sums or otherwise engage in any services for BEACON until sometime after the end of February 2016. The parties' discussions never resulted in any agreement between them as to BEACON.

9. By April 2016, the office was leased in Florida that KYLIE and JESSIE located and identified as suitable for operation of a call center for the debt settlement business or any other business generated by telephone. The office was operational by April 2016 having been equipped and otherwise made ready for engaging in the debt settlement business.

10. During their discussions that began in mid-January 2016, AMIR told the other parties he could generate debt settlement customers for BEACON. The parties discussed AMIR participating in BEACON but only if he actively participated and showed that he could generate business. AMIR only generated 4 signing customers for BEACON's debt settlement business. It became clear that BEACON was not going to survive if it focused on the debt settlement business. AMIR's inability to generate debt settlement customers hastened the end of Beacon as a debt settlement business.

11. On or around late May/early June 2016, AMIR and DAVID met at JESSIE and KYLIE's home to discuss taking a different direction with BEACON's call center. They decided over dinner to enter into the Vehicle Service Contracts ("VSC") business. The parties concluded their discussions the next day in JESSIE's office at BEACON to finalize their discussions over the material terms of their participation in the VSC business and their respective roles therein.

12. After their meeting in Florida, the parties exchanged multiple emails with multiple drafts of a Memorandum of Understanding ("MOU"). The parties ultimately signed the MOU for

the VSC business and referred to that business as America Auto Care Group. ***See* Exhibit A**, MOU at p. 1. On June 21, 2016, Kylie filed the articles of organization for AMERICA AUTO with the Florida Secretary of State.

13. Because the parties had already engaged in the debt settlement business as BEACON, the parties had to organize a different entity to engage in the VSC business. The parties, however, also wanted their participation and investment in BEACON to carry over into AMERICA AUTO because they decided to use BEACON's call center for the VSC business. Therefore, KYLIE formed AMERICA AUTO as a wholly owned subsidiary of BEACON and thereby carried their investment in BEACON into AMERICA AUTO.

14. The MOU detailed the parties' respective responsibilities and rights and provides the following with respect to the "working members" who are identified as KYLIE, JESSIE, & AMIR:

> **Vesting**. Member who are working members, or critical to the ongoing concern of the enterprise (Kylie, Jesse, Ryan [Amir]) who cease to be involved in the operation of the company, either in a working role, or significant oversight position, are subject to redemption of their membership interests in an automatic buyout by the company, for the value of the residuals, company surplus cash, and one half of the ongoing operating profit, all paid out as received by the company.

***See* Exhibit A,** MOU at § III(2)(b)(iv), p. 2. The MOU also provides for termination for cause as follows:

> **Termination of a Member for Cause:** A working member who is terminated for cause, (either as a member, or as an employee or independent contractor), may be terminated. Cause is defined as a criminal or civil matter, or a failure to execute their responsibilities, which is deemed by a unanimous vote of the remaining partners to be detrimental to the company or threatens the ongoing operation (such as a situation in which the financing, admin, or merchant services may be terminated, or in which marketing is substantially impacted) may be removed. A removed member's buyout is the same as the formula described in section iv, (Vesting), less 25%.

***See* Exhibit A,** MOU at § III(2)(b)(iv), p. 2.

15. Section III(3)(b) of the MOU states that AMIR's responsibilities include "affiliate recruitment and management, marketing and lead generation assistance, assistance and back fill for sales management." *See* **Exhibit A**, MOU at § III(3)(b), p. 3.

16. Throughout the operation of the COMPANIES, AMIR failed to execute his duties as required under the MOU and as per the parties' prior discussions about his involvement in BEACON and his involvement in AMERICA AUTO. Worse yet, in various discussions the parties had with AMIR, he admitted to engaging in questionable tax reporting that amounted to what appeared to be money laundering or the evasion of taxes.

17. Then, on January 17, 2017, DAVID was advised that AMIR was attempting to gain control over the bank accounts to make intercompany transfers from AMERICA AUTO/BEACON to AMIR's other companies. That caused DAVID to immediately advise AMIR that their partnership was over. However, cooler heads prevailed and the parties attempted to move forward with AMIR, but to no avail. AMIR simply failed and refused to perform his generation duties to the AMERICA AUTO.

18. On or about July 4, 2017, KYLIE, JESSIE & DAVID determined that the automatic buy-out provision (delineated above) had been triggered due to AMIR's failure to provide the services he agreed to provide to AMERICA AUTO. The parties also came to the conclusion that AMIR was not trustworthy due to (a) AMIR's attempt at gaining the ability to transfer funds from the COMPANIES to unrelated companies and (b) AMIR's statements about engaging in money laundering and/or tax evasion with prior companies in which he had participated.

19. Although the parties attempted to come to a settlement with Amir to separate him from the Companies, that attempt was unsuccessful and ultimately resulted in a demand for three million dollars ($3,000,000 USD).

20. Pursuant to the MOU, Plaintiffs are entitled to purchase any interest AMIR may have in the COMPANIES for a price determined under the protocol described therein.

**COUNT I DECLARATORY RELIEF**

21. Plaintiffs reincorporate and re-allege paragraphs 1 through 20, above, as though fully set forth herein.

22. The parties are unsure of their respective rights, duties, and obligations with respect to BEACON and AMERICAN AUTO and need a declaration of rights and liabilities with respect to the MOU and any prior agreements and equities of the relationship between the parties.

23. Plaintiffs are entitled to a declaration of their rights pursuant to Chapter 86 of the Florida Statutes because an actual controversy has arisen and now exists between Plaintiffs and Defendant concerning whether Plaintiffs are entitled to buy-out Defendant's interest in one or both of the COMPANIES.

24. Said controversy arose as a result of Defendant's failure to provide services as required by the MOU and the parties' prior discussions regarding Defendant's participation in the COMPANIES.

25. Defendant AMIR disagrees and refuses to cooperate with the buy-out provisions.

26. Therefore, Plaintiffs request that this Court construe the duly executed MOU and any other agreements that the Court may find amongst the parties and find that Plaintiffs are entitled to purchase all Defendant's ownership interest in one or both of the COMPANIES for a sum certain that the Court establishes.

27. Plaintiffs are entitled to a judgment that declares the rights of the parties.

**WHEREFORE,** Plaintiffs seek a declaratory action to determine their rights to enforce the terms of the MOU pursuant to Chapter 86, Florida Statutes. Plaintiffs request that this Honorable

Court issue a declaratory judgment that declares Plaintiffs are entitled to purchase all of Defendant's ownership interest in the COMPANIES, to the extent that Defendant has any such ownership interest, and determine the sum that must be paid for said ownership interest, and for such other relief as the Court may deem just and proper.

Respectfully submitted,

BRYAN J. YARNELL, PLLC
*Attorneys for Plaintiffs*
712 U.S. Highway One, Suite 301-24
North Palm Beach, FL 33408-7146
(561) 952-0671; (561) 828-6296 (fax)
bryan@civillawflorida.com
gio@civillawflorida.com

By: /s/ Bryan J. Yarnell, Esq.
Bryan J. Yarnell, Esquire
Florida Bar No.: 088900
Tabitha A. Taylor, Esquire
Florida Bar No.: 113915

# Memorandum of Understanding

## Project Title: America Auto Care (AAC)

## Vehicle Service Contracts (VSC)

**I – OPPORTUNITY**

**The "AAC Group" (America Auto Care, LLC) Consists of:**

1. **Kylie Britt (25%)**
2. **Britt, Jointly (25%)**
3. **ABG (Amir/Beling/Glenwinkel) (50%)**

**II - BUSINESS**

This MOA exists specifically to address the mutual understanding and representations of the Managing Members, Limited Members and Affiliates of the AAC Group in the operation of an Auto Warranty Business, operating a Retail Call Center, with a corporate headquarters and operational Call Center, an Affiliate Call Center Program and a proposed entry into the Dealership Auto Warranty Market.

**III - AGREEMENT**

1. **Profit Sharing and a Vesting Agreement**, between the parties shall include.
   a. Operating Members – Jesse and Kylie Britt
   b. Funding Members –
      i. Alliance Retirement Trust (ART)
      ii. Ryan Amir
   c. Amir and ART will match funding. An initial infusion of $100,000 has been provided. A guarantee of funding up to a total of $300,000 ($200,000 in additional Funding is guaranteed under the following schedule. DG has committed up to $100,000 in additional funding if needed and contingent upon the progress, profitability, and nature of the need for funding. We anticipate this operation should be profitable within the first ninety days. Profit is defined as meeting all marketing costs, administrative, facility, other overhead costs, and salaries and sales commissions, spiffs, and other incentives, encompassing the cost of all operations directly associated with the retail sales of Vehicle Service Contracts.
      i. Based on Need
      ii. $100K initial funding is based on promised completion of certain Benchmarks by mid July 2016.
         1. Obtaining Policy Financing (Compete, thru Omnisure)
         2. Approval by First Admin (Complete, thru Royal)
         3. Establishment of required State Licensing
         4. Establishment of Lead Source and Acquisition of first 1 Million Leads.
         5. Completion of the Facility (Operational Call Center)
         6. Test Marketing targeted by second week of July

EXHIBIT A

       7. Presentation of Deal Flow and Projected profits (Complete)

iii. Additional Funding

1. Contingent on Approved Operating Budget
2. Partner Approved Commission and Bonus Schedule
3. Establishment of minimum sales projections first six months.

2. **Formula for Distributions to Members:**

a. Member distributions are determined by the net available cash to disseminate to the Members after all expenses are met, and reserves have been set aside.

b. Priority of Distributions:

i. **Equal Distributions**: The first $100,000 in distributable profits in each quarter will be distributed equally according to Member Share Interest Percentage.

ii. **Priority Distributions:** distributable profits each quarter in excess of $100,000 shall be weighted in favor of the investors, with 70% of the distributable share going to the investors to accelerate the recovery of capital. Once the total distributions to the investing members (Equal Distribs + Priortiy Distribs) are equal to the invested capital, priority distributions will cease. Investor Capital Accounts may be reduced or the remaining Members will be trued up in future distributions.

iii. **Working Members:** Members who work in the enterprise will be paid in accordance to industry standards (once the company is fully profitable). This is separate from distributable profit shares in ratio to their ownership interests. This allows the company to develop a true base cost of operations, more easily replace a working member who no longer works within the company.

iv. **Vesting**. Members who are working members, or critical to the ongoing concern of the enterprise (Kylie, Jesse, Ryan) who cease to be involved in the operation of the company, either in a working role, or significant oversight position, are subject to redemption of their membership interests in an automatic buyout by the company, for the value of the residuals, company surplus cash, and one half of the ongoing operating profit, all paid out as received by the company.

v. **Termination of a Member for Cause**: A working member who is terminated for cause, (either as a member, or as an employee or independent contractor), may be terminated. Cause is defined as a criminal or civil matter, or a failure to execute their responsibilities, which is deemed by a unanimous vote of the remaining partners to be detrimental to the company or threatens the ongoing operation (such as a situation in which the financing, admin, or merchant services may be terminated, or in which marketing is substantially impacted) may be removed. A removed member's buyout is the same as the formula described in section iv. (Vesting), less 25%.

      vi. A member spouse is recused from voting in a termination matter involving a spouse.

3. **Rolls and Responsibilities**
   a. **Jesse Britt** – General Operations Manager, Marketing, Lead Generation, and Sales Management and Training.
   b. **Ryan Amir** – Affiliate Recruitment and Management, Marketing and Lead Generation assistance. Assistance and back fill for Sales Management if needed.
   c. **Kylie Britt** – Financial Controls, Data Analysis, Dealer Project Manager, Liaison to Administrators, Merchant Services and Finance Companies.
   d. **David Glenwinkel** – EMS Team; Strategic Planning, Asset Protection, Tax and Audit Oversight, GAAP Compliance, Banking Relationships.
   e. **Craig Beling** – Compliance Officer, Legal Department, Complaint Management

*How do we allocate responsibility for the flow of Lead Acquisition to Loading Data, to Allocating to the Dialer, monitoring fronters and closers to QC?

4. **Budget and Financial Requirements**
   a. One, Three and Five Year P&L Projection
   b. A cost analysis and process examination of operations, policies and best practices will be conducted on an ongoing basis and reported to the partners not less than four times per year (quarterly basis) in which the Profit and Loss, Balance Sheet, and other pertinent financial statements shall be made available to the Members.

5. **Organizational Requirements**
   a. Maintain GAAP compliant auditable accounting records.
   b. Maintain Organizational Good standing
   c. Changes to the business plan, organizational structure, or decisions regarding new lines of business require partner approval.

6. **Proprietary Rights**

   a. Define Proprietary Information held by the Company.

   b. Disclosures: Members requirement to disclose business activities in competing enterprises, or involvement in other business activities that may detract from the Members duties in this business.

7. **Member Level Decisions and Responsibilities**
   a. Members may allocate committees or advisor roles to make decisions appropriate to their roles.
   b. Member Advisor Role – Membership is not an operations role. A Member has a fiduciary duty to always act in the best interests of the company. Members may question decisions that place the company outside of its operational boundaries, affect the financial condition of the company beyond the boundaries of the agreed budget or industry norms for expenses or other risk behaviors.
   c. Member Votes are Required for:

   i. Change of Business Line
ii. Introduction to a new Business Line – Unanimous Vote
iii. Closure of the Business or Liquidation – Unanimous Vote
iv. Expenses that exceed industry standards – Two Thirds Vote
v. Onetime expenses that exceed an agreed base – but do not put the company at risk. - Majority Vote
vi. Change of Management Staff At the Officer Level or Higher – Majority Vote
vii. When in doubt inform the Members.

**IV – PROPRIETARY INFORMATION AND NON-DISCLOSURE**

A. In connection with the performance of Services hereunder, the Member may be exposed to confidential and proprietary information of the Company, whether or not so identified (including without limitation this Agreement). All such confidential and proprietary information shall be subject to the following:

i) Definitions. This Section shall apply to all "trade secrets" and "confidential information" disclosed by the Company to the Member and its personnel. For purposes of this Section, "trade secrets" entails information of the Company, including but not limited to, technical and non-technical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processors, financial data, financial plans, product plans and lists of potential customers, that is not generally known to, and is not readily ascertainable by proper means by others who could obtain economic value from its disclosure or use, and is subject to efforts by the Company to maintain its secrecy. For software, "trade secrets" includes, but is not limited to, source code and software system design. "Confidential information" entails any data or information, other than trade secrets, that is competitively sensitive material, and not generally known by the public, such as product planning information, marketing strategies, fees, participations, and internal performance results. For purposes of this Section, trade secrets and confidential information shall not include any information: (1) that is publicly available at the time of disclosure; (2) that is or becomes generally known to the public through no fault of the recipient; (3) that is obtained without restriction from an independent source having a bona fide right to use and disclose such information, without restriction as to further use or disclosure; (4) that the Company approves for unrestricted release by written authorization; or (5) that is required to be disclosed by law, except to the extent eligible for special treatment under an appropriate protective order.

[illegible]

Member who must obtain the trade secrets or confidential information in order to carry out the purposes for which the trade secrets and confidential information have been disclosed to the Member and who have first signed and delivered to the Company a nondisclosure agreement with respect to trade secrets and confidential information acceptable to the Company.

iii) Security Measures. To protect the trade secrets and confidential information of the Company, the Member shall adopt basic security measures of the kind commonly observed in industries that rely extensively on proprietary information. These security measures should include physical security measures, restrictions on access by unauthorized personnel, use of confidential agreements with personnel, and selective retention or destruction of sensitive materials, as appropriate.

iv) Destruction of Confidential Information. Upon the written request of the Company, the Member shall return or destroy all materials in its possession or within its control that contain or reflect the trade secrets or confidential information of the Company.

v) Survival. The nondisclosure provisions of this Section shall survive the termination of this Agreement and receiving Party's duty to hold confidential information in confidence shall remain in effect until the confidential information no longer qualifies as a trade secret or until the Company sends receiving Party written notice releasing receiving Party from this Section, whichever occurs first.

vi) Remedies. The unauthorized disclosure or use of any trade secrets or confidential information of the Company could cause irreparable harm and significant injury to the Company, which may be difficult to measure with certainty or compensate through damages. Accordingly, the Company shall have the right to seek and obtain an immediate injunction enjoining any breach by the Member of this mutual nondisclosure agreement upon application to a court of competent jurisdiction.

B. The Member shall not, without the prior written consent of the Company, use the Company's name in any advertising or promotional literature or publish any articles relating to the Company, this Agreement, the Services or any other matters or projects identified by the Company and shall not otherwise refer to the retention of Member to render consulting services hereunder.

**V- NON-SOLICITATION/NON-CIRCUMVENTION**

[illegible]

three times the annual salary of the former employee to the non-offending Party. The minimum amount for violation of the non-solicitation clause does not preclude the non-offending Party to seek all other available remedies including injunctive relief.

B. Non-Circumvention. The undersigned Parties, hereby irrevocable agree not to circumvent, disclose confidential information, bypass or obviate each other, directly or indirectly. The Parties agree not to circumvent or attempt to circumvent this Agreement by making an effort to contact, directly or indirectly, any business relationship of either Party, or using any Confidential Information, relating to the transactions contemplated herein without the full knowledge and acquiescence of the other Party, whether or not any consideration gained through circumvention would otherwise be deemed the rightful property of any Party.

**VII. WARRANTIES AND INDEMNIFICATION**

A. The Member represents and warrants that:

i) The Services shall be performed in accordance with, and shall not violate, applicable laws, rules or regulations, and standards prevailing in the industry and the Member shall obtain all permits or permissions required to comply with such laws, rules or regulations;

ii) The Materials shall be original, clear, and presentable in accordance with generally applicable standards in the industry;

iii) The Materials will not contain libelous, injurious, or unlawful material and will not violate or in any way infringe upon the personal or proprietary rights of third parties, including property, contractual, employment, trade secrets, proprietary information, and non-disclosure rights, or any trademark, copyright, or patent, nor will they contain any format, instruction, or information that is inaccurate or injurious to any person, computer system, or machine;

vi) The Member has full power and authority to enter into and perform its obligations under this Agreement; this Agreement is a legal, valid, and binding obligation of Member, enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, or similar laws affecting creditors' rights generally and equitable remedies);

v) The Member will perform the Services in accordance with the specifications established by the Company.

B. The Company represents and warrants that it has full power and authority to enter into and perform its obligations under this Agreement; this Agreement is a legal, valid, and binding obligation of the Company, enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, or similar laws affecting creditors' rights generally and equitable remedies); entering into this Agreement will not violate the organizational documents of the Company or any material contract to which it is a party.

C. The Member shall comply with all of the Company's standards and procedures.

including without limitation, standards relating to client management, development, production, security.

D. The Company shall not be liable for injury or death occurring to the Member or any of its employees or other assistants in the course of performing this Agreement.

E. The Member hereby indemnifies and holds harmless the Company, its subsidiaries, and affiliates, and their officers and employees, from any damages, claims, liabilities, and costs, including reasonable attorney's fees, or losses of any kind or nature whatsoever ("Loss") which may in any way arise from the Services performed by the Member hereunder, or any breach or alleged breach by Member of this Agreement, including the warranties set forth herein. The Company shall retain control over the defense of, and any resolution or settlement relating to, such Loss. The Member will cooperate with the Company and provide reasonable assistance in defending any such claim.

**VIII – SIGNATURES, GUARANTEES, AND ACKNOWLEDGEMENTS**

**This Memorandum of Understanding shall be binding as of** June 15th 2016.

**I acknowledge that I have read, understand, and agree to the terms, conditions, and legal requirements set forth in this Memorandum of Understanding. Further I agree to the reporting and communication requirements as defined in this document.**

[signature] Date June 15, 2016 For: Kyle B. Britt

[signature] Date June 15th, 2016 For: Ryan Amiradakis AKA RYAN AMIR

[signature] Date June 15th 2016 For: Jesse Britt

[signature] Date June 15th 2016 For: David Glendinning

# Exhibit "B"

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

BEACON FINANCIAL SOLUTIONS, LLC, a Florida limited liability company; AMERICA AUTO CARE, LLC, a Florida limited liability company; KYLIE BRITT, an individual; JESSIE BRITT, an individual; DAVID GLENWINKEL, an individual,

Plaintiffs,

v.

RAMIN AMIREBRAHIMI a/k/a RYAN AMIR, an individual

Defendant.

Case No. 50-2017-CA-009184-XXXX-MB

**NOTICE OF FILING NOTICE OF REMOVAL**

COMES NOW the Defendant, RAMIN AMIREBRAHIMI a/k/a RYAN AMIR, by and through his undersigned counsel, and pursuant to the applicable Florida Rules of Civil Procedure, hereby gives notice of filing the Notice of Removal filed in the United States District Court for the Southern District of Florida, Case No.: 9:17-cv-81119 on October 4, 2017.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of October, 2017 a true and correct copy of the foregoing has been electronically filed with the Clerk of Court by using the Florida Courts eFiling Portal System and furnished via E-mail Service, pursuant to Judicial Rule of Administrative Procedure 2.516 to: counsel for Plaintiff, Bryan J. Yarnell, Esq. and Tabitha A. Taylor, Esq., at: bryan@civillawflorida.com, gio@civillawflorida.com, BRYAN J. YARNELL, PLLC, 712 U.S. Highway One, Suite 301-24, North Palm Beach, FL 33408-7146.

FRANQUI TOTTEN, LLP
Attorney for Defendant AMIREBRAHIMI
Brickell City Tower
80 SW 8th Street
Suite 2000
Miami, Florida 33130
(305) 423-7011 – Office
(305) 494-8120 - Mobile

(305) 470-7433 – Facsimile
Tony@ftlawgroup.com


By: /s/ Anthony G. Franqui
      Anthony G. Franqui, Esq.
      Fl Bar No.: 543535